IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS RENZI | ) | No. 16-cv-02641 |
| Plaintiff, | ) | |
| | ) | Judge Hon. Matthew F. Kennelly |
| v. | ) | |
| | ) | Magistrate Judge Hon Susan E. Cox |
| UNION PACIFIC RAILROAD | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF, THOMAS RENZI'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

Now comes Plaintiff, THOMAS RENZI, by his undersigned counsel, and for his response to Defendant, UNION PACIFIC RAILROAD COMPANY's Statement of Facts in Support of its Motion for Partial Summary Judgment pursuant to Local Rule 56.1(a)(3), states as follows:

### Parties, Jurisdiction and Venue

1.     Defendant, UNION PACIFIC RAILROAD COMPANY ("Union Pacific") is a common carrier by rail in interstate commerce. (Plaintiff's Amended Complaint Exhibit A at ¶ 2.)

**RESPONSE: Admits.**

2.     Plaintiff THOMAS RENZI was a Union Pacific employee assigned to the Memence facility that is owned, operated and controlled by Union Pacific located at Diagonal Road Crossing, City of Momence, Illinois. (Ex. A at ¶ 5)

**RESPONSE: Admits.**

1

3.      On November 17, 2016, Plaintiff filed his Amended Complaint against Union Pacific seeking recovery for injuries allegedly sustained during the course of his employment and for alleged retaliation he suffered. (Ex. A at ¶ 7.)

**RESPONSE: Admits.**

4.      Union Pacific answered Plaintiff's Amended Complaint denying all material allegations. (Union Pacific's Answer to Plaintiff's Amended Complaint Exhibit B)

**RESPONSE: Admits.**

5.      This Court has jurisdiction under 28 U.S.C. § 1331, as the rights and liabilities of the parties are governed by the Act of Congress known as the Federal Employers' Liability Act, 45 U.S.C. § 56 and the Federal Railroad Safety Act, 49 U.S.C. § 20109 *et seq* 29 C.F.R. Part 1982; 29 CFR § 1982.114.

**RESPONSE: Admits.**

## Relevant Facts

**Facts Related to Count II (FRSA 1)**

6.      Plaintiff was a signal maintainer to a territory covering areas east of Kankakee, Illinois for Union Pacific. (Ex. A at ¶ 8.)

**RESPONSE: Admits.**

7.      On February 14, 2014, he was responsible for troubleshooting malfunctions in signal equipment. (Plaintiff Thomas Renzi Deposition Exhibit C at p. 21:2-6)

**RESPONSE: Admits.**

8. On that date, Plaintiff noticed that the gate light was out and stopped to repair it. (Ex. C at p. 21:9-13)

**RESPONSE: Admits.**

9. He used a terminal wench to open the frozen gate mechanism, testifying that he was trained to do so by everybody he worked with from 2001 to when he got injured. (Ex. C at p. 22:18-22, 23:1-2.)

**RESPONSE: Admits.**

10. When he stepped back to allow room for the gate box to open, he got "tangled up with a piece of iron sticking out of the ground and [...] fell backwards into a ditch." (Ex. C at p. 37:4-13.)

**RESPONSE: Admits.**

11. As a result, he claims to have sustained injuries to his knee and shoulder. (Ex. C at p. 53:3-4)

**RESPONSE: Admits.**

12. On May 2, 2014, while Plaintiff was on medical leave of absence related to the February 14, 2014 event, he received a Notice of Investigation because he was charged with violating General Code of Operating Rule 1.13, Reporting and Complying with Instructions, and Yellow Book 7.1.6, Maintenance in Good Condition. (Ex. C at p. 81:11-13.) Specifically, Plaintiff was charged for a rodent infestation and failure to maintain inspection records. (Ex. C at p. 81:16-23)

**RESPONSE: Admits.**

13. The investigation that led to the charge was performed by Manager Curtis Cornwell. While inspecting the signal bungalow that Plaintiff was responsible for, Mr. Cornwell found dead mice, mouse droppings, chewed up prints, battery cards, and wires. (Curtis Cornwell Deposition Exhibit F at p. 40:22-24.)

**RESPONSE: Admits.**

14. Charges were brought up against Plaintiff even though he was off for two months because Mr. Cornwell opined that the condition of the bungalow was a problem long before Plaintiff went out on medical leave. The conditions that Mr. Cornwell discovered would have predated Plaintiff's absence. (Ex. F at p. 46:12-17.)

> **RESPONSE: Denies. Cornwell testified that problem predates other two maintainers. (Plaintiff's Statement of Facts Ex. B, Cornwell at p.46: 12-17)**

15. Mr. Cornwell also charged Plaintiff for failure to maintain inspection records because Plaintiff did not properly perform testing at the Station Street crossing, a crossing for which Plaintiff was responsible. (Ex. F at p. 14:9-12.) Specifically, there was no showing of any testing in the system. (Ex. F at p. 18:6-16.)

**RESPONSE: Admits.**

16. Mr. Cornwell testified that the lack of records kept by Plaintiff was an incredibly serious issue because "if [Union Pacific] don't have records of [the crossing] being tested, in the FRA's eyes, it didn't get tested." (Ex. F at p. 19:2-3.)

> **RESPONSE: Denies. Cornwell did not testify that it was a "serious issue". (Plaintiff's Statement of Facts Ex. B, Cornwell at p.19:2-3)**

17. Plaintiff testified that he has never gotten the impression from Mr. Cornwell that he was retaliating against him. (Ex. C at p. 156:13-15.)

**RESPONSE: Admits.**

18. Plaintiff testified the Director of Signal Nels Johnson retaliated against him although Mr. Cornwell was the charging officer. (Ex. C aty p. 74:14-16.) He believes Mr. Johnson retaliated against him for getting injured. (Ex. C at p. 175:21-24, 176:1-3.) However, Mr. Johnson testified that he did not play any role in bringing the two charges against Plaintiff. (Nels Johnson Deposition Exhibit G at p. 77:3-5.) Mr. Johnson also did not participate in the investigation. (Ex. F at p. 90:11-12)

> **RESPONSE: Denies. Cornwell said he would have run charges by Nels Johnson as a courtesy. (Plaintiff's Statement of Facts Ex. B, Cornwell at p. 43:11-24, 44:1-2.)**

19. Mr. Johnson testified that he is "never critical or anybody filing an injury report." (Ex. G at p. 10613-16.)

**RESPONSE: Admits.**

20. Plaintiff also believes that he was harassed by Mr. Johnson because their one on ones were "hostile." (Ex. C at p. 75:10-15)

**RESPONSE: Admits.**

21. However, he agreed that as a condition of his returning from medical leave, he was required to do one on ones with Mr. Johnson and Mr. Cornwell. (Ex. C at p. 76:5-10.)

**RESPONSE: Denies. Renzi never said he agreed as a condition of return to work. (Plaintiff's Statement of Facts Ex. A, Renzi at p.76: 5-10)**

22.     Initially, the hearing on the charges was set for May 7, 2014. However, Plaintiff sent multiple letters requesting postponements of the hearing because the doctor had not yet released him to return to work. (Plaintiff's Requests for Postponement Exhibit D. April 9, 2015 Hearing Transcript Exhibit E at p. 12:20-26.) Meaning, the delay in Plaintiff's hearing until April of 2015, was as a result of Plaintiff requesting postponement due to being out on medical leave – no because Union Pacific was holding him out of service. The charges against Plaintiff proceeded to a hearing on April 9, 2015 and were subsequently dismissed. (Ex. A at ¶ 19.)

**RESPONSE: Admits.**

23.     Plaintiff did not receive any discipline related to any of the two charges, and suffered no disciplinary action or financial loss related to the two charges. (Ex. C at p. 91:23-24, 1-10.)

> **RESPONSE: Denies. This charge would have impacted his performance tracker maintained by UPRR. (Plaintiff's Statement of Facts Ex. D, Sanchez at p.120:6-23; p.123:1-5.)**

## Facts Related to Count III (FELA 2)

24.     On or about March 4, 2015, Plaintiff was working with an electronic technician, James Laur, to shunt islands on a main tack. (Ex. C at p. 94:11-12, 93:4.)

**RESPONSE: Admits.**

25.     There was an active ice storm and everything was covered with ice. (Ex. C at p. 97:12-18.)

**RESPONSE: Admits.**

26. He was in a bungalow 50 feet north of the crossing of the road. (Ex. C at p. 98:9-15.)

**RESPONSE: Admits.**

27. The bungalow was in his territory since approximately 2012 or 2013, and he was the person responsible for it. (ex. C at p. 99:1-7.)

**RESPONSE: Admits.**

28. Plaintiff testified that there was a Positive Train Control Tower ("PTC Tower") approximately less that ten feet away from the bungalow. (Ex. C at p. 99:20-22.)

**RESPONSE: Admits.**

29. While walking to get in Mr. Laur's line of sight, a piece of ice fell from the antenna from the PTC Tower and hit Plaintiff in the shoulder. (Ex. C at p. 96:5-8, 100:20-24.)

**RESPONSE: Admits.**

30. Plaintiff testified that he did not hear ice cracking from the PTC Tower immediately prior to impact. (Ex. C at p. 100:17-19.)

**RESPONSE: Admits.**

31. Plaintiff believes Union Pacific "could have located the antenna of the tower on the other side of the cabin which would have kept [....] anybody from walking around it" and the antenna "could be more properly maintained." (Ex. C at p. 106:14-17.)

**RESPONSE: Admits.**

32. He admitted that he did not complaint to anyone about the location of the PTC Tower. (Ex. C at p. 102:10-12, 20-23.)

**RESPONSE: Admits.**

33. When asked if there was anything about the antenna on the PTC Tower that was not properly maintained, he answered "I am not a tech." (Ex. C at p. 1-6:18-21.)

**RESPONSE: Admits.**

34. When asked if he knew one way or the other if the PTC Tower was properly maintained or not, he answered "No, I don't. Sorry." (Ex. C at p. 106:23-24.)

**RESPONSE: Admits.**

35. Mr. Laur testified that a Signal Maintainer did not have any responsibility to ensure that there is no ice build-up on PTC Tower antennas. (Deposition of James Laur Exhibit H at p. 83:11-14.)

**RESPONSE: Admits.**

36. Mr. Johnson confirmed "there's no maintenance required of an antenna." (Ex. G at p. 104:13-14.)

**RESPONSE: Admits**

37. Plaintiff also believes that Union Pacific caused him to be injured because they sent him out in "horrible" conditions to do the testing. (Ex. C at p. 107:8-9.)

**RESPONSE: Admits.**

38. However, he admits he did not refuse to go out that day. (Ex. C at p. 107:8-9.)

**RESPONSE: Admits.**

## Facts Related to Count IV (FRSA 2)

39. In the early morning of February 26, 2016, Plaintiff received a phone call from Singal Operation Command requesting assistance for another employee Joseph Almasy. (Ex. C at p. 114:1-12, 113:22-24.) Mr. Almasy was troubleshooting at approximately 49.96 on the Villa Grove Subdivision because the crossing gates were down. (Ex. C at p. 115:24, 116:1-5, 6-8.)

**RESPONSE: Admits.**

40. When Plaintiff arrived on scene, he did not do a job briefing with Mr. Almasy. (Ex. C at p. 117:21-23.)

**RESPONSE: Denies. Renzi said they had just started talking about a briefing. (Plaintiff's Statement of Facts Ex A, Renzi at p.117: 21-24; p.118: 1)**

41. Shortly thereafter, the Director of Signal Nels Johnson and Thomas Luksan who is the General Director the Maintenance of Way Department, arrived on scene. (Ex. C at p. 122:3-13.)

**RESPONSE: Admits.**

42. Plaintiff suggested to the directors that they put out an XS on the crossing bevause traffic was backing up. (Ex. C at p. 121:205.) Mr. Johnson advised Plaintiff to wait on a track permit before putting out an XS on the crossing. (Ex. C at p. 121:12-17.) Mr. Johnson has no reason to believe that Mr. Luksan would go against his plan. (Ex. G at p. 147:19-25.)

**RESPONSE: Admits.**

43. Mr. Johnson testified that Mr. Luksan had absolutely no knowledge of signal processes and procedures. (Ex. G at p. 144:23-25, 145:1-8.)

**RESPONSE: Admits.**

44. Mr. Johnson also testified that he did not take part in any job briefing with regard to disabling the crossing. (Ex. G at p. 147:15-17.) To that contrary, he instructed the crew not to disable the crossing because it would have been faster to fix the problem. (Ex. G at p. 147:19-21.)

      **RESPONSE: Denies. Johnson testified that Joseph Almasy led a job briefing. (Plaintiff's Statement of Facts Ex. E, at p. 129:22-24; 130:1-7.)**

45. Mr. Johnson went to the cabin to study prints while waiting for a track permit (Ex. G at p. 137:6-15.) After some time in the cabin, Mr. Johnson looked up and observed the gates going up. (Ex. G at p. 137:17-25.) Mr. Johnson left the cabin to investigate why the gates went up and that is when he "learned that [Plaintiff] had placed a shunt on the track, which is disabling the crossing." (Ex. G at p. 138:1-3.)

      **RESPONSE: Admits.**

46.     After the gates went up, Mr. Johnson brought Plaintiff and Mr. Almasy into the cabin to look at the unit and they saw the shunt on the unit represented by the EZ value. (Ex. G at p. 138:4-7.)

**RESPONSE: Admits.**


47.     Mr. Almasy denied placing the shunt down, but Plaintiff admitted that he was the person who placed the shunt. (Ex. G at p. 150:10-13.)

**RESPONSE: Admits.**


48.     Plaintiff also admitted during his deposition that he did so without a proper job briefing. (Ex. C at p. 137:6-9, 136:16-18.)

**RESPONSE: Admits.**

49.     At that time he placed the shunt, Plaintiff was the only individual who had knowledge of the crossing being disabled. (Ex. G at p. 11:18-21.)

> **RESPONSE: Denies. It was a group decision to place the shunt and crossing was never disabled. (Plaintiff's Statement of Facts Ex. A, Renzi at p.136: 19-24; p.137:1-5)**


50.     During his deposition, Plaintiff agreed that the signal personnel responsible for disabling the crossing had to fill out a Form 24235 in accordance with Rule 8.1.15 (Ex. C at p. 139:6-10.) Mr. Almasy also testified that "when a crossing is disabled, you have to fill out the necessary documentation." (Joseph Almasy Deposition Exhibit 1 at p. 86:1-4.)

**RESPONSE: Admits.**

51.     Plaintiff was required to follow Rule 8.1.15 to place a shunt on the track, even if he was there to troubleshoot and they had secured a track permit. (Ex. G at p. 153:11-23.)

**RESPONSE: Denies. One has to follow Rule 8.1.15 only if disabling crossing. (Plaintiff's Statement of Facts Ex. D, Sanchez at p. 148: 11-18)**

52.     Mr. Johnson testified that Rule 8.1.15 has a 17-step process. (Ex. G at p. 164:18-20.)  Part of the 17-step process is to ensure that forms are filled out and contacts are made so that the shunt does not remain in place. (Ex. G at p. 166:7-10.)

**RESPONSE: Admits.**

53.     Specifically, Mr. Johnson was asked and answered the following:

Q:     Okay. Explain to me why the 17-step disabling process is so important.

A:     The 17-step process is designed as a reminder with several different [...] checks and balances in there to make sure, once a crossing is disabled, that its properly enabled and tested and working safely again.
In railroad history, there's been far too many occurrences where we've done something like this, and we've walked off, and we've left [a shunt] and we end up with a car/train collision and a fatality.

(Ex. G at p. 165:13-23.)

**RESPONSE: Admits.**

54.     Mr. Johnson also testified that the disabling process "involves the safety of our train crews and the traveling public.  It needs to be taken very seriously [] [a]nd it takes a while to do it and do it right.  That's why I instructed the guys not to do it because I knew we would fix it a lot faster if we just focused on the repair." (Ex. G at p. 166:19-24.)

**RESPONSE: Admits.**

55.     Although Mr. Johnson took certain steps to ensure that the crossing would be safe once he realized that the 17-step process was not followed, he maintained that it does not change the fact that Plaintiff's action was a critical violation. (Ex. G at p. 168:6-12.)

**RESPONSE: Admits.**

56.     During the job debrief, Plaintiff was informed that he was in violation of putting a shunt down without filling out paperwork. (Ex. C at p. 139:20-23.)

**RESPONSE: Admits.**

57.     Plaintiff admitted that he did not fill out any forms that night. (Ex. C at p. 138:7-9.)

**RESPONSE: Admits.**

58.     He was charged with 56.1.3, comprising signal system safety and he was also charged with Rule 137,2.3, disabling crossing warning devices.  Plaintiff admitted that he was familiar with the properly trained on Rule 137.2.3 (Ex. C at p. 131:14-18, 132:1-17)

**RESPONSE: Admit.**

59.     He admits that Rule 137.2.3 applies to XS, jumpering up crossings, and disabling. (Ex. C at p. 133:2-4, 134:5-11.)

**RESPONSE: Admit.**

61. Mr. Johnson testified that Plaintiff was the only person terminated as a result of the January 26, 2016 event because "he's the one [who] made the egregious decision to disable the crossing." (Ex. G at p. 152:24-25, 153:1-4.)

**RESPONSE: Admits.**

62. Mr. Almasy, Mr. Johnson, and Mr. Luksan testified under oath that placing a shunt is disabling a crossing. (Ex. 1 at p. 104:19-21; Ex. G at p. 163:5-23, 164:2-14; Thomas Luksan Deposition Exhibit J at p. 86:7-9.) Mr. Laur, who was not present on the date of the incident, also testified consistent with his experience as a Signal Electronic Technician, that placing a shunt is disabling a crossing. (Ex. H at p. 121:24, 122:1-3.)

> **RESPONSE: Denies. Almasy testified that he placed two shunts earlier that morning but wasn't disabling a crossing. (Plaintiff's Statement of Facts Ex. G, Almasy at p.104: 19-23)**

63. Unlike Plaintiff, Mr. Almasy never put the shunt on the track. (Ex. G at p. 153:5-9.) Mr. Johnson testified that Mr. Almasy did what he was asked to do, which was a secure a track permit. (Ex. G at p. 155:6-8.)

**RESPONSE: Admits.**

64. Mr. Johnson also testified that he did not have any role in the decision made by Union Pacific to terminate Plaintiff at or about February 17, 2016. (Ex. G at p. 12:13-16.) No one from Union Pacific specifically asked Mr. Johnson his opinion with regard to terminating Plaintiff. (Ex. G at p. 12:20-24.)

**RESPONSE: Admits.**

65.     Mr. Johnson confirmed that Plaintiff's prior injuries had nothing to do with his discipline related to the January 26, 2016 event. (Ex. G at p. 170:1-4.)

**RESPONSE: Admits.**

Respectfully submitted,
Thomas Renzi,


By:  *s/James T. Farnan*
          James T. Farnan


James T. Farnan
Ridge & Downes
101 N. Wacker Drive, Suite 200
Chicago, IL 60606
Tel (312) 372-8282
Fax (312) 372-8560
jfarnan@ridgedownes.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certified that a true and correct copy of the above and foregoing instrument was properly forwarded to all counsel of record as listed below by:

_____United States Mail, postage prepaid and sealed;

_____United States Certified Mail, postage prepaid and return receipt requested;

_____Hand Delivery;

_____UPS/Next Day Air;

_____Facsimile Transmission;

__X__Local Rule 5.9 Electronic Filing (U.S.D.C., ND IL); and/or

_____Email (pdf)

on April 6, 2018.

Ms. Brody E. Dawson
Ms. Sarah-Joel M. Privert
Union Pacific Railroad Company
101 N. Wacker Drive
Room 1920
Chicago, IL  60606
bedawson@up.com
smpriver@up.com

_s/James T. Farnan_

James T. Farnan
Ridge & Downes
101 N. Wacker Drive, Suite 200
Chicago, IL 60606
Tel (312) 372-8282
Fax (312) 372-8560
jfarnan@ridgedownes.com