# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| THOMAS RENZI, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 16 C 2641 |
| UNION PACIFIC RAILROAD COMPANY, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Thomas Renzi sued Union Pacific Railroad in a four-count amended complaint alleging two counts of retaliation for reporting workplace injuries in violation of the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109, and two counts of negligent workplace injury in violation of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51. Union Pacific has moved for summary judgment on both of the FRSA claims (counts 2 and 4) and one of the FELA claims (count 3). For the reasons stated below, the Court denies the motion.

## Background

The following facts are undisputed except where otherwise noted. From 2001 to 2016, Thomas Renzi was a signal maintainer for Union Pacific Railroad assigned to a territory including Momence, Illinois. As a signal maintainer, Renzi was responsible for inspecting, testing, and troubleshooting signal equipment in his territory.

On a snow-covered day in February 2014, Renzi noticed a malfunctioning gate

light in his territory and stopped to repair it. To make the repair, he attempted to open a box containing the gate mechanism. When he stepped back to allow the box to swing open, Renzi tripped over a piece of iron protruding from the ground that had been obscured by snow. He sustained injuries to his shoulder and knee from the fall that forced him into medical leave. Two other signal maintainers, Billy Shields and Dan Rolih,[1] were assigned to maintain Renzi's territory during his absence.

More than two months after his initial injury, Renzi's newly assigned supervisor, Curtis Cornwell, brought charges against him for alleged violations of Union Pacific's maintenance and recordkeeping rules. Renzi was accused of allowing a bungalow in his territory to become infested with rodents and of failing to maintain electronic inspection records for equipment he was required to test. On the latter charge, Renzi was specifically accused of keeping only paper records when Union Pacific rules required records be kept digitally.

Renzi has testified that the bungalows were compliant with maintenance rules when he was injured, Pl.'s Ex. A, dkt. no. 59-1, at 87:20-88:7, and that his decision to keep records on paper was a product of unique circumstances at his bungalow and the advice of his previous supervisor, *id.* at 88:17-91:18. Union Pacific disputes these characterizations, pointing to Cornwell's assessment that the maintenance issues preceded Shields' and Rolih's assignment to the territory, Pl.'s Ex. B, dkt. no. 59-2, at 46:15-19, and to Renzi's previous supervisor's statement that he "never would have" advised Renzi to keep hand-written inspection records, Def.'s Ex. P, dkt. no. 61-4, at

---

[1] Rolih's name was alternatively spelled "Raleigh" in some of the submissions to the Court.

52:4-8. In any case, no charges were brought against Shields or Rolih even though they had been assigned to maintain bungalows and inspection records for the ten weeks preceding the investigation.

During Renzi's formal hearing on these charges, Union Pacific submitted, among other evidence, photographs depicting rodent-infested equipment that did not actually exist at the bungalow Renzi was charged with failure to maintain. Pl.'s Ex. B, dkt. no. 59-2, at 86-89. This was discovered, and the photographs were withdrawn. *Id.* And, ultimately, Renzi was cleared of both charges.

Renzi recovered enough to return to work as a signal maintainer in February 2015, about a year after his initial injury. But less than a month later, he was injured again while testing signal equipment with James Laur, a Union Pacific electronics technician. The two men were working outdoors during an ongoing winter storm when a piece of ice fell from a Positive Train Control (PTC) tower and struck Renzi's previously injured shoulder.

The parties dispute the circumstances of Renzi's second injury. Renzi has testified that he was advised to work indoors by his manager and accordingly requested that he and Laur remain inside to avoid the icy conditions. Pl.'s Ex. A, dkt. no. 59-1, at 102:14-19, 107:22-108:17. But, Renzi and his expert contend, Laur was the senior employee and thus had authority to decide whether the pair should work outside. *Id.* at 108; Pl.'s Ex. D, dkt. no. 59-4, at 105:14-107:22. Renzi asserts that Laur decided they should brave the elements, setting the stage for Renzi's injury. Renzi and his expert also testify that an alternative placement of the PTC antenna farther from the path employees regularly walked, Pl.'s Ex. A, dkt. no. 59-1, at 106:14-17, or greater efforts to

3

remove ice and snow, Pl.'s Ex. D, dkt. no. 59-4, at 110:13-111:24, could have mitigated the hazard of falling ice.  For its part, Union Pacific points to Laur's testimony that Renzi never made a request to stay indoors on the day of his injury and that he failed to outright refuse to go outside.  Pl.'s Ex. F, dkt. no. 59-6, at 123:17-24.  Union Pacific also asserts that no viable alternative for the placement of the antenna or reasonable ice removal efforts would have saved Renzi from the injury.

Renzi was back to work shortly after his second injury, and things were relatively uneventful for several months.  Then, shortly before 7:00 AM on a morning in January 2016, he received a call from another signal maintainer, Joe Almasy, about a malfunctioning railroad crossing in Renzi's territory.  Several hours before Renzi arrived, Almasy had been dispatched to troubleshoot the crossing, which was closed and flashing even when no train was approaching.  Soon after Renzi, Nels Johnson, Director of Signal Maintenance, and Tom Luksan, Regional General Director for Maintenance of Way, came upon the scene.  Johnson has testified that the two made a wrong turn in their rental car and arrived at the malfunctioning crossing by chance.  The parties agree that once all four men arrived on the scene, they constituted a single work group under Union Pacific guidelines.

Traffic began to back up behind the closed crossing.  The group agreed that it was necessary to get special permission called a "track permit" to undertake further troubleshooting on the track.  A track permit allows employees to safely work on one of the tracks without fear of a train approaching on the same track.  Almasy returned to his truck where he requested and received a track permit.  Soon after the permit issued, the parties agree, Renzi placed a shunt on the track in an attempt to restore the crossing to

4

proper function.

Johnson, the Director of Signal Maintenance who had happened upon the scene, later brought charges against Renzi and Almasy for placing the shunt allegedly in violation of a Union Pacific regulation that requires a 17-step process before disabling a railroad crossing. The charges against Almasy were dropped after he successfully argued that he had not personally placed the shunt. Renzi was terminated.

The parties dispute the basic function of placing a shunt on a track, the decision-making process that led to the shunt's placement, and whether the Union Pacific policy was unevenly enforced against Renzi and Almasy. Perhaps most fundamentally, Renzi suggests—and his expert witness corroborates—that shunting a track amounts to simulating the presence of a train, *enabling* an affected crossing rather than *disabling* it. Pl.'s Ex. A, dkt. no. 59-1, at 180:16-181:23; Pl.'s Ex. D, dkt. no. 59-4, at 148:11-19; *see also* Pl.'s Ex. G, dkt. no. 59-7, at 104:19-23 (describing placing a shunt as not necessarily disabling a crossing). Thus, he asserts, the policy he was terminated for violating simply did not apply to his action because he did not disable a crossing. Union Pacific, on the other hand, asserts that placing a shunt *disables* an affected crossing and that its policies require an employee to complete a 17-step safety procedure—which Renzi admits he did not complete—before disabling a crossing. Pl.'s Ex. E, dkt. no. 59-5, at 163:24-165:23; Pl.'s Ex. H, dkt. no. 59-8, at 86:7-9.

Renzi next contends that the work group collectively discussed troubleshooting techniques and decided that he should place the shunt. Pl.'s Ex. A, dkt. no. 59-1, at 127:8, 136:19-137:5; *see also* Pl.'s Ex. G, dkt. no. 59-7, at 104:7-10 (noting that placing a shunt was discussed). He therefore contends that the group is collectively

5

responsible for placing the shunt. Union Pacific disputes this; it cites Nels Johnson's testimony that Renzi made the decision to shunt the track without anyone else's input. *See* Pl.'s Ex. E, dkt. no. 59-5, at 11:18-21.

Finally, Renzi notes that Almasy freely admitted to having personally placed two shunts earlier in the morning in his attempts to troubleshoot the malfunctioning crossing but faced no charges for those actions. Pl.'s Ex. G, dkt. no. 59-7, at 86:3-88:7, 104:19-23. He contends this is evidence the policy was unevenly enforced. Union Pacific counters that Johnson and Luksan were unaware of Almasy's previous use of shunts to troubleshoot the track and that their failure to charge Almasy thus does not evince uneven enforcement. Def.'s Resp. to Pl.'s Rule 56.1 Stat. of Add'l Facts ¶ 32.

## Discussion

Summary judgment is proper only when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Poullard v. McDonald*, 829 F.3d 844, 852 (7th Cir. 2016). On a motion for summary judgment, the Court draws reasonable inferences in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). In other words, "[s]ummary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Union Pacific moves for summary judgment on three of Renzi's four claims: count 2, which alleges a violation of the FRSA's anti-retaliation provision; count 3, which alleges a violation of the FELA; and count 4, which alleges a second violation of the

6

FRSA's anti-retaliation provision.

## A. Renzi's FRSA Claims

Renzi asserts two claims of unlawful retaliation under FRSA section 20109(a)(4). That provision prohibits railroads from discharging or otherwise discriminating against employees when such action is taken, "in whole or in part," in retaliation against an employee's protected activity, including efforts "to notify, or attempt to notify, the railroad carrier . . . of a work-related personal injury." 49 U.S.C. § 20109(a), (a)(4). To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) the employer knew or suspected, actually or constructively, that he engaged in the protected activity; (3) he suffered an adverse action; and (4) the circumstances permit an inference that the protected activity was a contributing factor in the adverse action. 29 C.F.R. § 1985.104(e)(2); *see also* 49 U.S.C. § 20109(d)(2)(A) (incorporating by reference the rules and procedures applicable to enforcement actions under 49 U.S.C. § 42121(b)); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018) (paraphrasing the regulation). "Once that showing is made, the rail carrier can still escape liability if it can show, by clear and convincing evidence, that it would have taken the same action absent the protected activity." *Armstrong*, 880 F.3d at 381.

### 1. Renzi's First FRSA Claim (Count 2)

In his first FRSA claim, Renzi alleges that he was subject to charges and an investigation in retaliation for reporting his February 2014 workplace injury. Union Pacific admits that the claim satisfies the first two elements of a prima facie FRSA retaliation case—i.e., that Renzi made a protected injury report and that the railroad knew about it. Def.'s Br. in Supp. of Mot. for Partial Summ. J. at 4. But it disputes that

the charges and investigation instituted soon after the report amounted to "adverse action"[2] within the scope of the statute. Union Pacific asserts that a plaintiff must demonstrate that he suffered some "disciplinary or financial loss relating to the charge" to make out a prima facie FRSA claim and that the plaintiff has failed to produce evidence that he has suffered such an injury. *Id.* at 6. It points to two district court opinions in support of this contention. *See id.* at 5-6 (citing *Dunn v. BNSF Ry. Co.*, No. C17-0333JLR, 2017 WL 3670559 (W.D. Wash. Aug. 25, 2017); *Brisbois v. Soo Line R.R. Co.*, 124 F. Supp. 3d 891 (D. Minn. 2015)).

The parties have cited, and the Court can find, no controlling authority on the appropriate definition of "adverse action" under the FRSA. But precedent interpreting the analogous Title VII retaliation provision proves helpful. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Robinson v. Perales*, 894 F.3d 818 (7th Cir. 2018). In *Burlington*, the Supreme Court interpreted the phrase "adverse action" in a retaliation case to include any action "materially adverse" to the employee's interest. *Burlington*, 548 U.S. at 67-68. The Court went on to adopt the Seventh Circuit's definition of materiality: an employer's action is materially adverse if it "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (7th Cir. 2006)).

The Court's analysis rested in part on the relevant Title VII retaliation provision's use of the word "discrimination" without the qualifications used elsewhere in the law. *Id.* at 61-62. It concluded that this suggested that the word was meant to capture more

---

[2] Although the regulation omits the additional modifier, Union Pacific and some relevant case law describe the standard as requiring "adverse *employment* action." The Court uses the language of the regulation, though this distinction appears immaterial.

than just discharge, compensation, and other fundamental employment actions. The FRSA retaliation provision is worded quite similarly to its Title VII counterpart. Title VII forbids an employer "to discriminate against any of his employees . . . because [they have] made a charge" under the substantive provisions of the act. 42 U.S.C. § 2000e-2(a). The FRSA prohibits adverse employment-related actions *and* actions that "*in any other way discriminate* against an employee . . . due in whole or in part [] to the employee's lawful, good faith [engagement in protected conduct, including reporting a work place injury]." 49 U.S.C. § 20109(a) (emphasis added). The Court is persuaded that *Burlington*'s analysis is applicable here.

This reading is further supported by administrative precedent. The Department of Labor's Administrative Review Board (ARB)—the body that reviews FRSA administrative decisions—has repeatedly held that charging an employee with a policy violation, instituting an investigation, or simply threatening adverse action against an employee can constitute adverse action, even where the employee is not ultimately discharged or suspended and suffers no economic harm. *See, e.g.*, *Vernace v. Port Auth. Trans-Hudson Corp.*, No. 12-003, 2012 WL 6849446 (ARB Dec. 21, 2013); *Stallard v. Norfolk S. Ry. Co.*, No. 16-028, 2017 WL 4466937 (ARB Sept. 29, 2017).

Thus "adverse actions" under the FRSA include not just "discriminatory actions that affect the terms and conditions of employment," but also any action that would dissuade an objectively reasonable employee from exercising her rights under the law. *Id.* at 64. The Supreme Court—and, more recently, the Seventh Circuit—admonished that "context matters" when making that assessment. *Robinson*, 894 F.3d 818, 830 (citing *Burlington*, 548 U.S. at 68-69)). The same action might therefore constitute a

9

minor annoyance in once context and an adverse action in another.

The district court opinions Union Pacific cites do not contradict this reading. In *Dunn*, the court expressly declined to determine whether an investigation alone constitutes an adverse action but dismissed the plaintiff's claim because he entirely failed to allege facts related to the disputed investigation and hearing. *See Dunn*, 2017 WL 3670559, at *9. The court's conclusions about the sparse factual record in that case are of little value here, where the factual record is far more developed. In *Brisbois*, on the other hand, the district court indeed held that the disputed investigation was not a materially adverse action. *Brisbois*, 124 F. Supp. 3d at 903. It noted that finding an adverse action "any time a rail carrier attempts to determine whether [an employee] has violated a rule," typically by pursuing a formal investigation, "would have major implications for labor relations in the rail industry." *Id.* at 903. But "context matters." *Robinson*, 894 F.3d at 830. Though the materiality requirement may not be met "any time" an investigation is instituted, the requirement may be satisfied where an investigation—along with its implicit threat of discipline—would dissuade a reasonable employee from exercising her rights under the FRSA. *Cf. Burlington*, 548 U.S. at 67.

Renzi asserts that he was treated more harshly than the two signal maintainers who were assigned to his territory during his medical leave—and thus responsible for it at the time the charges were filed—but who never faced similar charges. Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. at 5. He then points to "fraudulent evidence" presented and then withdrawn at his disciplinary hearing as further evidence of retaliatory motive. *Id.* This evidence of disparate treatment, which bears perhaps most directly on the question of retaliatory motivation, also goes to how the filing of charges would impact an

employee's willingness to exercise his rights under the FRSA. In addition, Renzi's expert witness testified that Renzi's injury would have impacted his "performance tracker," an employee scoring system allegedly maintained by Union Pacific, potentially subjecting him to increased "intervention" by his supervisors. *See* Pl.'s Resp. to Def.'s Local Rule 56 Stat. of Facts ¶ 23; Pl.'s Ex. D, dkt. no. 59-5, at 120:7-123:17. The sum of these slights in their context, Renzi argues, is an adverse action within the meaning of the third factor of the FRSA retaliation provision.

Renzi has produced evidence that, when viewed in the light most favorable to him, gives rise to a genuine factual dispute over whether the charges and investigation constituted an "adverse action." That is, a reasonable jury could conclude the investigation was sufficient to dissuade a reasonable employee from reporting workplace injuries in light of evidence that (1) Renzi was allegedly treated differently than Shields and Rolih, the signal maintainers assigned to his territory in his absence; (2) misleading evidence was undisputedly introduced and then withdrawn at his hearing on the maintenance and recordkeeping charges; and (3) his injury allegedly subjected him to negative consequences in Union Pacific's performance tracker that may have subjected him to additional interventions by his supervisors. A jury will have to decide this issue.

    **2.**    **Renzi's Second FRSA Claim (Count 4)**

In his second FRSA claim, Renzi alleges that he was unlawfully terminated in retaliation for reporting his February 2014 and March 2015 workplace injuries. Union Pacific admits that the claim satisfies the first three elements of a prima facie FRSA retaliation case—i.e., Renzi made two protected injury reports, the railroad knew about

11

them, and his termination constituted an adverse action. Def.'s Reply Br. in Supp. of Mot. for Partial Summ. J. at 6. It argues, however, that Renzi has failed to produce evidence that the protected injury reports were a "contributing factor" in its decision to terminate him. Alternatively, Union Pacific argues that, even if Renzi has met that initial burden, the railroad has demonstrated "by clear and convincing evidence, that it would have taken the same action absent the protected activity." *Armstrong*, 880 F.3d at 381.

To make a prima facie showing that protected conduct was a "contributing factor," "a[n] FRSA plaintiff need not show that retaliation was the *sole* motivating factor in the adverse decision." *Id.* at 382 (emphasis in original). She must, however, produce evidence that "retaliation was *a* motivating factor." *Id.* (emphasis in original). Further, the retaliatory motive must be a proximate cause of the ultimate adverse action. *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 877-78 (7th Cir. 2016). A plaintiff may make this prima facie showing by direct or circumstantial evidence. *See Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 160 (3d Cir. 2013); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 790 (8th Cir. 2014). Temporal proximity and disparate application of company policies are two kinds of circumstantial evidence relevant to this analysis. *See, e.g.*, *Kuduk*, 768 F.3d at 792 (assessing temporal proximity); *Araujo*, 708 F.3d at 160 (assessing disparate application of policies); *see also Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 885 (S.D. Iowa 2013) (listing other kinds of circumstantial evidence embraced by the ARB).

At this stage, it is enough to observe that Renzi has produced sufficient evidence to establish that there is a genuine factual dispute regarding whether his protected injury reports contributed to his discharge. Specifically, he has produced evidence that the

decision to place a shunt was made by the working group collectively—Renzi, Almasy, Johnson, and Luksan—rather than by Renzi alone.  Union Pacific disputes that evidence.  Further, the record tees up material issues regarding whether shunting a track *disables* or *enables* a crossing, a question that goes to the very basis for Renzi's termination.  Finally, Renzi has produced evidence from which a reasonable jury could conclude that the Union Pacific 17-step policy was unevenly enforced:  Almasy freely admitted that he had placed two shunts earlier in the morning of the incident without completing any paperwork but faced no charges for those apparent violations.

Union Pacific's alternative argument—that it has demonstrated that it would have discharged Renzi even if he had not reported his injuries—does not entitle it to summary judgment.  The railroad bears the burden to demonstrate its contention by clear and convincing evidence.  *See Armstrong*, 880 F.3d at 381.  As the moving party, it must accomplish this feat despite reasonable inferences being drawn in favor of the non-moving party.  *See Celotex*, 477 U.S. at 322; *cf. Liberty Lobby, Inc.*, 477 U.S. at 255 ("[T]he clear-and-convincing standard of proof should be taken into account in ruling on summary judgment.").  It has failed to do so.

## B. Renzi's FELA Claim (Count 3)

The FELA imposes liability against railroads for employees' injuries "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier" or from "any defect or insufficiency" in its equipment resulting from the carrier's negligence. 45 U.S.C. § 51; *see also Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 911 (7th Cir. 2012) (describing the history of the FELA).  The railroad is liable if its "negligence played any part, even the slightest, in producing the injury." *Green v.*

*CSX Transp., Inc.*, 414 F3d 758, 766 (7th Cir. 2005). To survive summary judgment, "the plaintiff must offer evidence creating a genuine issue of fact on the common law elements of negligence, including duty, breach, foreseeability, and causation." *Id.*; *Lynch*, 700 F.3d at 911. But "the quantum of evidence required to establish liability in an FELA case is much less than in an ordinary negligence action." *Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990). Indeed, "[t]he lenient standard for avoiding summary judgment under the FELA merely mirrors the pro-plaintiff slant of the substantive law. . . . The right to a jury determination is part and parcel of the liberal remedy afforded" under the FELA. *Id.*

But summary judgment is nonetheless appropriate where a plaintiff fails entirely to produce evidence showing that there is a genuine factual dispute regarding any given element of her claim. *See Heater v. Chesapeake & Ohio Ry. Co.*, 497 F.2d 1243, 1247 (7th Cir. 1974). For instance, where a non-moving plaintiff simply rests her opposition to summary judgment on the bare allegations in her complaint, summary judgment is appropriate. *See Deutsch v. Burlington N. R.R. Co.*, 983 F.2d 741, 743-44 (7th Cir. 1992). Where a plaintiff presents direct or circumstantial evidence leading to genuine issues of material fact on the elements of FELA liability, however, summary judgment is inappropriate so long as "a jury [could] make reasonable inferences based on that circumstantial evidence." *Lynch*, 700 F.3d at 917. This is true "even where conflicting inferences are also appropriate and no direct evidence establishes which inference is correct." *Id.*

Union Pacific appears to make two arguments for summary judgment on Renzi's Count 3 FELA claim. First, it argues that it did not, as a matter of law, have a duty to

14

protect Renzi from injuries resulting from "natural accumulations of ice or snow." Def.'s Br. in Supp. of Mot. for Partial Summ. J. at 11. Relatedly, it appears to argue that even if it did have a duty, it did not breach that duty. Second, Union Pacific argues that ice falling from an antenna during an ice storm was unforeseeable as a matter of law. *Id.* at 12-13. Renzi, on the other hand, argues that Union Pacific employees, including James Laur, were on notice of the icy conditions that led to his injury but negligently subjected him to those conditions despite the risks.

Union Pacific's first contention, that it did not owe Renzi a duty of care, is incorrect. In support of its contention, it cites an unpublished opinion by the undersigned judge, *Dyer v. Oakbrook Corp.*, No. 99 C 0694, 2000 WL 1499446 (N.D. Ill. Oct. 6, 2000). That case is entirely inapposite. *Dyer* was a slip-and-fall case in which the Court exercised diversity jurisdiction. *Id.* at *1. As a diversity case originating in Illinois, state substantive law controlled. *See generally Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). In that limited context, this Court recited Illinois law's general rule that "a landowner is under no duty to remove natural accumulations of ice or snow." *Dyer*, 2000 WL 1499446, at *2 (emphasis omitted). As Union Pacific well knows, the instant claim does not involve a slip-and-fall under Illinois law but rather an action under federal law by its former employee for an alleged workplace injury. Indeed, the Court made precisely the same distinction soon after the *Dyer* decision. *See Knight v. Grand Victoria Casino*, No. 98 C 8439, 2000 WL 1898843, at *1 (N.D. Ill. Dec. 28, 2000) ("Defendant [] is not entitled to avoid liability based on the 'natural accumulation' rule. Under the Jones Act, an employer has a duty to provide its employees with a safe workplace . . . . Defendant's contention that it cannot be held liable for natural

15

accumulations of snow and ice is directly contrary to this principle."); *id.* (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("[P]rinciples of liability under FELA apply in Jones Act Cases.").

Under the FELA, Union Pacific owes a duty to furnish a reasonably safe workplace to each of its employees. *See Bailey v. Cent. Vt. Ry.*, 319 U.S. 350, 352 (1943); *Green*, 414 F3d at 766; *Barrett v. Toledo, Peoria & W. R.R. Co.*, 334 F2d 803, 803 (7th Cir. 1964); *Anderson v. Elgin, Joliet & E. Ry. Co.*, 227 F.2d 91, 86 (7th Cir. 1955). Although "the statute confines the universe of compensable injuries to those sustained by employees, during employment," *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 704 (2011), a railroad "must exercise a degree of care commensurate with the risks to prevent the accumulation of snow and ice in such quantity, form, and location as to be a menace to the safety of its employees within its yards," *Anderson*, 227 F.2d at 96.

Because Renzi was owed a duty by Union Pacific and has produced evidence from which a reasonable jury could infer that his injury from falling ice resulted from a breach of that duty on the part of the railroad or its agents, Union Pacific's first argument fails. *Cf. McDonald v. Ne. Ill. Reg.*, 249 F. Supp. 2d 1051, 1054 (N.D. Ill. 2003).

Union Pacific next argues that Renzi's injury from falling ice during an active ice storm was unforeseeable as a matter of law. It is true that "foreseeability of harm is an essential ingredient of [FELA] negligence." *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 117 (1963). But as the Supreme Court made clear in *Gallick*, foreseeability under the FELA is a question of fact for the jury to decide. *See id.* at 117-18 ("[T]his requirement has been satisfied in the present case by the jury's findings."). The railroad

cites *Jordan v. S. Ry. Co.*, 970 F.2d 1350 (4th Cir. 1992), to support its contention that foreseeability is a question of law in this context. Def.'s Br. in Supp. of Mot. for Partial Summ. J. 10. But *Jordan* principally concerned a provision of the Safety Appliance Act that imposes strict liability for employees' workplace injuries. *See Jordan*, 970 F.2d at 1352 (citing 45 U.S.C. §§ 1-16). Although the Fourth Circuit noted that "whether a particular device is a 'safety appliance' is a question of law," it did not address foreseeability under the FELA. *Id.* Its reasoning thus has no application in this case.

Union Pacific also argues that "[t]he record is devoid of any evidence that [Renzi] notified Union Pacific of a dangerous condition in the area where he worked prior to March 2015." Def.'s Br. in Supp. of Mot. for Partial Summ. J. at 13. Though literally true, this statement lacks legal significance. Although not technically "prior to March 2015," the record contains evidence that Renzi asked not to work outside *on the morning of his injury* but was nevertheless directed by James Laur to work in a winter storm. Renzi has even testified that he was advised by his manager early in the day to stay inside, apparently based on their shared concern that working in the elements could be dangerous. Because the FELA imposes liability for the negligent actions of a railroad's "agents[] or employees," 45 U.S.C. § 51, this evidence is certainly probative of the injury's foreseeability.

Renzi has also introduced evidence from his expert that the PTC tower could have been differently constructed or maintained to minimize the risk to employees during winter weather, giving rise to another factual dispute relevant on the issue of foreseeability. Finally, the parties agree that an active ice storm was raging at the time of Renzi's injury. It is a question of fact for the jury to decide whether falling ice is a

17

foreseeable harm in such conditions.

In sum, genuine issues of material fact exist on both the duty and foreseeability elements of Renzi's FELA claim. Union Pacific is not entitled to summary judgment on Count 3.

## Conclusion

For the foregoing reasons, the Court denies Union Pacific's motion for partial summary judgment [dkt. no. 51]. The case is set for a status hearing on August 30, 2018 at 9:30 a.m. to discuss the possibility of settlement as well as the currently set trial date of December 10, 2018.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 20, 2018